Merrimack
No. 2005-170

## Venise Theresa Gonya & a.

### v.

## Commissioner, New Hampshire Insurance Department

Argued: January 19, 2006
Opinion Issued: May 18, 2006

*Watson & Lemire, P.A.*, of Portsmouth (*Thomas R. Watson* and *Jennifer A. Lemire* on the brief), and *Baron & Budd, P.C.*, of Dallas, Texas (*Alan Rich* and *Stephen Blackburn* on the brief, and *Mr. Rich* orally), for the petitioners.

*Kelly A. Ayotte*, attorney general (*Suzanne M. Gorman*, senior assistant attorney general, on the brief, and *J. Christopher Marshall*, attorney, orally), and *Rackemann, Sawyer & Brewster*, of Boston, Massachusetts (*Eric A. Smith* on the brief), for the respondent.

DUGGAN, J. The petitioners, Venise Theresa Gonya and Roxane S. Scaife, appeal an order of the Superior Court (*McGuire*, J.) denying their petition to declare RSA 402-C:40, I (1998) unconstitutional and enjoin its enforcement. We affirm.

The record reflects the following undisputed facts. Each petitioner represents the estate of a deceased tort claimant. Among the defendants in the tort cases are two corporations that were insured under excess liability policies issued by The Home Insurance Company (Home), a New Hampshire insurance company. On June 13, 2003, the Superior Court (*McGuire*, J.) placed Home in liquidation and appointed the defendant, the Commissioner of the New Hampshire Insurance Department (Commissioner), as liquidator of Home.

The liquidation proceedings are being conducted pursuant to the New Hampshire Insurers Rehabilitation and Liquidation Act, RSA chapter 402-C (1998 & Supp. 2005). RSA 402-C:40, I, provides that the petitioners, as third parties asserting claims against an insured of Home, may file claims directly with the Commissioner, as the liquidator of Home. However, the statute conditions the filing of a claim in the liquidation proceeding upon the third party releasing the insured from a certain degree of liability on the claim. *Id.*

Neither petitioner has filed a claim with the Commissioner. Instead, the petitioners, purporting to represent all persons with existing or potential claims against Home, sought declaratory and injunctive relief in the superior court, requesting the court to rule that RSA 402-C:40, I, insofar as it "forces a claimant to give up a common-law cause of action without procedural safeguards or meaningful access to information," is unconstitutional on its face. After jointly filing a stipulation of facts, the parties moved for summary judgment on all claims. The trial court granted the Commissioner's motion and denied the petitioners' cross-motion.

On appeal, the petitioners first argue that RSA 402-C:40, I, violates the doctrine of unconstitutional conditions because it conditions the potential third party claimant's ability to file a claim in the liquidation upon the relinquishment of that claimant's cause of action against the insured, thus infringing upon the claimant's constitutional right to the redress of his actionable injuries, *see* N.H. CONST. pt. I, art. 14. Second, they argue that RSA 402-C:40, I, violates the equal protection rights of potential third party claimants by treating them differently from similarly situated potential plaintiffs. Finally, they argue that RSA 402-C:40, I, violates the due process rights of potential third party claimants by requiring them to choose between filing a claim in liquidation and pursuing their cause of action against the insured without allowing them "to obtain enough information to make a reasoned, intelligent and voluntary choice."

In reviewing a statute, we presume it to be constitutional and we will not declare it invalid except upon inescapable grounds. *Baines v. N.H. Senate President*, 152 N.H. 124, 133 (2005). "The constitutionality of a statute involves a question of law, which we review *de novo*." *Hughes v. N.H. Div. of Aeronautics*, 152 N.H. 30, 34 (2005). We address each of the petitioners' arguments in turn. Because the petitioners rely solely upon the State Constitution, we base our decision upon it alone, using federal cases only to aid in our analysis. *See State v. Grey*, 148 N.H. 666, 668 (2002).

*I. The Doctrine of Unconstitutional Conditions*

The New Hampshire Insurers Rehabilitation and Liquidation Act (the Act), RSA chapter 402-C, contains procedures for the liquidation of insolvent or otherwise financially troubled insurance companies. *See* RSA 402-C:20 (1998). Among its stated purposes are the "[e]nhanced efficiency and economy of liquidation" and the "[e]quitable apportionment of any unavoidable loss." RSA 402-C:1, IV(c)-(d) (1998). The Act is to be "liberally construed" to effect its stated purposes. RSA 402-C:1, III (1998).

RSA 402-C:40, I and II (1998) provide that when a cause of action is asserted by a third party against an insured of the insurance company in liquidation, both the third party and the insured have the option to file a claim with the liquidator on that cause of action. RSA 402-C:40, I, further provides, however, that the filing of a claim by the third party

> shall release the insured's liability to the third party on that cause of action in the amount of the applicable policy limit, but the liquidator shall also insert in any form used for the filing of third party claims appropriate language to constitute such a release. The release shall be void if the insurance coverage is avoided by the liquidator.

The petitioners first argue that RSA 402-C:40, I, places an unconstitutional condition upon their ability to file claims directly against Home in liquidation by requiring them to relinquish their causes of action against the insureds, thus infringing upon their State constitutional right to the redress of their actionable injuries. *See* N.H. CONST. pt. I, art. 14.

Part I, Article 14 of the State Constitution states:

> Every subject of this state is entitled to a certain remedy, by having recourse to the laws, for all injuries he may receive in his person, property, or character; to obtain right and justice freely, without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws.

This provision provides that all citizens have a right to the redress of their actionable injuries. *Gould v. Concord Hospital*, 126 N.H. 405, 409 (1985). It makes civil remedies readily available and guards against arbitrary and discriminatory infringements on access to the courts. *City of Dover v. Imperial Cas. & Indemn. Co.*, 133 N.H. 109, 116 (1990). Although the right to recover for one's injuries is not a fundamental right, *id.*, it is "an important substantive right," *Carson v. Maurer*, 120 N.H. 925, 931-32 (1980), and is "accorded solicitous protection," *Gould*, 126 N.H. at 409.

Had the legislature simply required that all tort claimants with claims against persons insured by an insolvent insurer release the insured of liability up to the applicable policy limits, rather than conditioning the right to file a claim in liquidation upon their agreeing to do so, we have no doubt that it would have been a violation of the claimants' constitutional rights. *See Petition of Abbott*, 139 N.H. 412, 416 (1995) (to justify the complete abolition of the right of any class of persons to recover damages for their injuries, there must be a satisfactory substitute for the right). However, the issue presented in this case is whether a statute can condition the grant of a benefit—here, the ability to file a claim directly against the insurer in liquidation—upon the waiver of the right to recover damages from the insured to the extent of the applicable policy limits.

We first note that we are not convinced that the doctrine of unconstitutional conditions is applicable to this case. As Justice Stevens explained in his dissenting opinion in *Dolan v. City of Tigard*, 512 U.S. 374, 407 n.12 (1994) (citations omitted), "Although it has a long history, the 'unconstitutional conditions' doctrine has for just as long suffered from notoriously inconsistent application; it has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question." Furthermore, while we have applied a similar constitutional analysis in a context different from the one before us today, *see J.E.D. Assoc's, Inc. v. Town of Atkinson*, 121 N.H. 581, 584-85 (1981) (discussing "unconstitutional exactions and requirements" placed upon developers by municipalities), *overruled on other grounds by Town of Auburn v. McEvoy*, 131 N.H. 383, 388 (1988), we have never expressly adopted the doctrine of unconstitutional conditions or applied it under the State Constitution. Nevertheless, we will assume, for the purposes of this case only, that the doctrine is applicable to this situation.

The doctrine of unconstitutional conditions "bars government from arbitrarily conditioning the grant of a benefit on the surrender of a constitutional right, regardless of the fact that the government appropriately might have refused to grant the benefit at all." *National*

*Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 747 (1st Cir. 1995), *cert. denied*, 515 U.S. 1103 (1995). However, not all conditions are prohibited. *Id.* If a condition is "sufficiently related" to the benefit, then it may validly be imposed. *Id.*

The Commissioner does not dispute that the ability to file a claim in liquidation is the type of government benefit contemplated by the doctrine of unconstitutional conditions. Assuming, then, that the right to the redress of actionable injuries is a constitutional right that is afforded protection by the doctrine of unconstitutional conditions, *but see* Sullivan, *Unconstitutional Conditions*, 102 HARV. L. REV. 1413, 1427 (1989) (indicating that the doctrine protects only "preferred right[s] normally protected by strict judicial review"), we must consider whether the benefit in this case is conditioned on the surrender of the constitutional right at issue, and, if so, whether the condition is sufficiently related to the benefit. *See National Amusements, Inc.*, 43 F.3d at 747.

The Commissioner contends that although the filing of a claim in the liquidation is contingent upon the release of the insured from liability up to the applicable policy limits, it is not conditioned upon the "surrender" of the third party claimant's constitutional right to the redress of his actionable injuries. He argues that the third party claimant is still exercising his right to the redress of his injuries because his claim is submitted to the superior court, which has the ultimate authority to allow or disallow claims in liquidation, and, if the claim is allowed, he receives the opportunity to be compensated through the liquidation proceeding as an alternative to the usual legal proceeding against the insured. *See Ramos v. Jackson*, 510 So. 2d 1241, 1241-42 (Fla. Dist. Ct. App. 1987) (holding that similar statute did not amount to a denial of Florida constitutional right of access to the courts because "the injured party has a right to either seek relief against alleged tortfeasors or waive same and seek relief from the receiver of the insolvent insurer").

However, in arguing that the pursuit of a claim in liquidation is essentially an equivalent alternative means of exercising one's right to the redress of his actionable injuries, the Commissioner ignores his own concessions that "[u]ncertainty over liquidation recovery is inherent in the fact of the insurer's insolvency" and "it is apparent that [third party claimants] are unlikely to receive payment in full in [a] liquidation." At least to some extent, the third party who files a claim in the liquidation is surrendering his ability to receive full compensation for his actionable injuries. Thus, the release of the insured from liability up to the applicable policy limits arguably amounts to a partial surrender of a constitutional right. *See Trovato v. DeVeau*, 143 N.H. 523, 525 (1999) (Part I, Article 14

does not guarantee that all injured persons will receive full compensation for their injuries, but does require a remedy that conforms to the statutory and common law rights applicable at the time of the injury).

Assuming, without deciding, that the condition involves the surrender of a constitutional right, we next consider whether the condition in this case is sufficiently related to the benefit. *See National Amusements, Inc.*, 43 F.3d at 747. As stated above, if a condition is "sufficiently related" to the benefit, then it may be validly imposed under the doctrine of unconstitutional conditions. *Id.* The parties disagree, however, over the applicable test for determining whether the condition is "sufficiently related" to the benefit.

The Commissioner, citing *National Amusements, Inc.*, 43 F.3d at 747, contends that the condition is sufficiently related to the benefit so long as it is "germane" to the legitimate state interests underlying its imposition. The petitioners argue that we must apply the test that we articulated in *J.E.D. Associates, Inc. v. Town of Atkinson*, 121 N.H. at 584-85, where we held that a city could not condition the issuance of a land use permit upon the relinquishment of property rights without violating Part I, Article 12 of the State Constitution unless the condition is specifically attributable to the benefit.

The petitioners rely upon the reasoning of the United States Supreme Court in *Dolan v. City of Tigard*, 512 U.S. at 386, 388-91, to argue that the test articulated in *J.E.D. Associates* is applicable to an analysis under the doctrine of unconstitutional conditions. In *Dolan*, the Court applied the doctrine of unconstitutional conditions to consider the constitutionality of a land use regulation that conditioned approval of a building permit upon the dedication of a portion of the applicant's property to flood control and traffic improvements. *Id.* at 377, 385. In its analysis, the Court asked first whether there is an "essential nexus" between the "legitimate state interest" and the condition imposed. *Id.* at 386. Finding that a nexus did exist, the Court then asked "whether the degree of the exactions demanded by the city's permit conditions bears the required relationship to the projected impact of petitioner's proposed development." *Id.* at 388. After discussing various state court standards for the adequacy of this relationship, including the *J.E.D. Associates* standard, *id.* at 389-91, 389 n.7, the Court adopted a "rough proportionality" test, which it found "best encapsulates what we hold to be the requirement of the *Fifth Amendment*." *Id.* at 391 (emphasis added). Thus, the petitioners in this case argue that the *J.E.D. Associates* specifically attributable test must be incorporated into the *Dolan* analysis as a requirement of our State Constitution. They then argue that we must apply this modified *Dolan* analysis in determining the constitutionality of RSA 402-C:40, I.

Accordingly, they argue that we must apply the same standards in determining the constitutionality of RSA 402-C:40, I, as we would for a land use regulation that conditions a benefit upon the relinquishment of an individual's Fifth Amendment right to just compensation for the taking of his property.

■ We are not persuaded that the standard applied in land use regulation cases such as *Dolan* and *J.E.D. Associates* applies here. *Cf. Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702 (1999) (noting that the Supreme Court has not extended the *Dolan* "rough proportionality" test beyond the context of exactions under the Takings Clause). Nothing compels the State to provide the petitioners with the right to file a claim in the liquidation; rather, the ability to file a claim is a purely gratuitous benefit offered by the government to third party claimants. By contrast, in *Dolan* and other land use regulation cases, the benefit of a building permit is not purely gratuitous, but is actually compelled by constitutional standards. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834 (1987). A land use regulation that empowers a municipality to deny a building permit may, in and of itself, constitute a taking if it does not "substantially advance legitimate state interests" or if it "den[ies] an owner economically viable use of his land." *Id.* (quotations omitted). It is this principle that gave rise to the unconstitutional condition analysis employed in land use regulation cases, such that "a permit condition that serves the same legitimate [state interest] as a refusal to issue the permit should not be found to be a taking if the refusal to issue the permit would not constitute a taking." *Id.* at 836. Thus, the standard to be applied where the issuance of a building permit is conditioned on the waiver of a constitutional right may be more stringent than that applied where the granting of a *purely gratuitous benefit* is conditioned on the waiver of a constitutional right. Furthermore, the doctrine of unconstitutional conditions does not require that the same standards be applied in every case to which the doctrine applies, regardless of the nature of the constitutional right at issue. *See, e.g., Vance v. Barrett*, 345 F.3d 1083, 1092 (9th Cir. 2003) (acknowledging that standards for analyzing an unconstitutional condition in the context of Fifth Amendment takings claim may not be the same as in the context of a procedural due process claim); *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 46 (1st Cir. 2002) (noting that, under the doctrine of unconstitutional conditions, "different inquiries have developed which apply to different types of property" in the context of Fifth Amendment takings claims; when dealing with intellectual property, the condition need only be "rationally related to a legitimate Government interest" (quotation omitted)); *Louisiana Pacific v. Beazer*

*Materials & Services*, 842 F. Supp. 1243, 1251 n.18 (E.D. Cal. 1994) (noting that "[t]he Supreme Court has, either explicitly or implicitly, resolved unconstitutional conditions claims by an examination of the standards applicable to claims of direct violation of the underlying constitutional right").

Having relied solely upon *Dolan* and *J.E.D. Associates* as presenting the relevant test, which we have rejected, the petitioners do not articulate on appeal any alternative test or case for us to apply in our analysis of the unconstitutional condition issue. Although in the trial court the petitioners urged application of a middle-tier analysis, relying upon *Carson*, 120 N.H. at 932, they make no such argument in their brief to this court. Accordingly, we will not address it. *See Appeal of AlphaDirections*, 152 N.H. 477, 483-84 (2005).

The Commissioner contends that the relevant inquiry is merely whether the condition is "germane" to the legitimate state interests underlying its imposition. The Commissioner has not provided us with a workable definition of "germane" in the context of this inquiry, but the petitioners defined it for the trial court as requiring that the statute not be unreasonable or arbitrary. In line with this definition, the Commissioner argues that the condition in this case is germane to the legitimate legislative objectives of the statute, and is thus constitutional, because the condition "directly serves the legislative objective of protecting policyholders and apportioning unavoidable loss." In response, the petitioners argue that, even under this standard, RSA 402-C:40, I, is unconstitutional. We disagree.

The petitioners advance three arguments in support of their position. First they contend that because New Hampshire is "one of only six states" with a condition like that imposed by RSA 402-C:40, I, while "forty-four other states are able to administer insurance liquidations without a release provision," there can be no connection between the condition in RSA 402-C:40, I, and the legislative objectives of RSA chapter 402-C. The petitioners argue that allowing third party claimants to file a claim in the liquidation without simultaneously requiring them to release the insured of any liability would not defeat the legislative objectives and, thus, the release provision is arbitrary and does not achieve the legislative goals.

We acknowledge that, in drafting RSA 402-C:40, I, the legislature could have employed any of a number of solutions to the problem of equitably apportioning unavoidable loss. The popularity of the legislature's choice is not for us to consider; whether a statute is reflective of a majority or minority position, or even whether we favor one position over the other, is not determinative of whether the statute is constitutional. Furthermore, cases cited by the petitioners have not declared unconstitutional statutes

that impose a condition similar to that imposed by RSA 402-C:40, I. *See, e.g., Ramos*, 510 So. 2d at 1241-42 (holding that similar provision did not amount to a denial of access to the courts under state constitution); *see also Koken v. Reliance Ins. Co.*, 841 A.2d 588, 591-93 (Pa. Commw. Ct. 2004), *rev'd*, 893 A.2d 70 (Pa. 2006).

The petitioners next argue that by conditioning the filing of claims in the liquidation upon the third party releasing the insured of liability up to the policy limits, RSA 402-C:40, I, not only fails to serve the legislative objective of protecting policyholders, but actually defeats that objective by discouraging the filing of claims in the liquidation and encouraging increased litigation against policyholders in the form of actions for prejudgment attachment. The argument, however, overlooks the fact that an inquiry into whether a statute is reasonable or arbitrary does not require that, where the legislative objective is to protect certain individuals, those individuals must be provided with the maximum possible degree of protection. While there may be ways to further reduce litigation against policyholders, it is apparent that the release provision in RSA 402-C:40, I, provides policyholders at least some degree of protection.

Furthermore, permitting third parties to unconditionally file claims in the liquidation would arguably provide no greater protection to policyholders than the current liquidation scheme. The Act protects policyholders by, among other things, allowing them to file claims in liquidation on their own behalf when they are sued by a third party. *See* RSA 402-C:40, II. Any resulting recovery received by the policyholders in the liquidation offsets any judgment against them in the underlying suit. *See* RSA 402-C:40, III (1998). This avenue of access to liquidation proceeds provides policyholders with some degree of protection, although they remain liable for the balance of the judgment. Allowing potential third party claimants to file claims directly in the liquidation, even when filing is conditioned upon a release, encourages at least some potential third party claimants to file, thus relieving those policyholders of the burdens of litigation and liability for the balance of any judgment that could have been levied against them. While eliminating the condition may encourage even more potential third party claimants to file claims directly in the liquidation, doing so would provide policyholders less protection, leaving them open to liability for any amount within the policy limits that is not paid out to the third party claimant in the liquidation.

Finally, the petitioners argue that the burden imposed upon potential third party claimants by RSA 402-C:40, I, so outweighs the benefits conferred upon the public that the statute is unreasonable. Specifically, they contend that the statute overburdens potential third party claimants by: (1) precluding access to an insured's potential excess insurance

coverage available through other solvent insurers; (2) precluding third party claimants from becoming post-judgment creditors of the insolvent insurer; and (3) forcing third party claimants to decide whether to file a claim in the liquidation without providing them with adequate information upon which to base that decision.

With respect to the first contention, the petitioners argue that, where the policy directly affected by the liquidation is a primary insurance policy, which it is not in this case, an "excess insurer's responsibility to pay for claims in excess of the [primary] policy limit is triggered by legal liability of the insured in excess of primary policy limits." Thus, the petitioners argue that, if a claim is allowed in the liquidation in the full amount of the primary policy limits, the excess coverage will not be triggered because the actual payment from the liquidation will be less than the full amount allowed. The Commissioner argues that it would be unreasonable for an excess insurer to contend that the release has such an effect, and the possibility of that happening is speculative and hypothetical. We agree that the petitioners' concern is based upon nothing more than speculation. The petitioners have pointed to no authority indicating that releasing an insured of liability up to the policy limits of a primary policy will automatically preclude access to the insured's excess insurance coverage for any liability that exceeds the limits of the policy issued by the insurer in liquidation. Nor have the petitioners cited any instances in which this result has occurred. The mere possibility that an excess insurer could attempt to deny coverage as a result of the release is insufficient to render the statute unreasonable.

With respect to their second contention, the petitioners argue that by choosing not to file a claim in the liquidation and instead choosing to initiate a lawsuit against the insured, third party claimants lose "the ability to proceed against the [insolvent] insurance company as a judgment creditor after having successfully prevailed against [the] insured," who may be or become insolvent. However, the petitioners have pointed to nothing in RSA 402-C:40, I, that would preclude them from filing a claim in the liquidation after receiving a judgment against the insured. The Commissioner argues that the only provision in the Act that may create such a bar is RSA 402-C:37 (1998), which establishes claim filing deadlines applicable to all of the insolvent insurer's creditors. Although the petitioners have not articulated any constitutional challenge to that provision, we note that nothing therein treats third party claimants, whether filing as post-judgment creditors or otherwise, differently from any other claimants.

With respect to their final contention, the petitioners argue that RSA 402-C:40, I, forces potential third party claimants to elect one of two

options, where "[n]either [option] is certain to result in a recovery and the State will not provide [them] with any needed information upon which [their] decision can be made." They argue that it is grossly unfair to ask them to make this decision without the information needed in order to ascertain whether the insured is solvent or otherwise insured and whether the liquidation might yield a larger recovery for them than would a direct action against the insured. While the imposition of this choice may surely be viewed as a burden on the potential third party claimant, it is not so burdensome as to render RSA 402-C:40, I, unreasonable. As is acknowledged in the petitioners' own argument, risk of little, or even no, recovery is inherent in any litigation. Every potential plaintiff is faced with the task of assessing the viability of recovery against a potential defendant. The option to file a claim in the liquidation of an insolvent insurer may provide for some plaintiffs a means of recovery not otherwise available against the potential defendant. As the Commissioner argues in his brief, "To the extent such a choice could be considered a burden, it is simply a legislative[ly] allocated consequence of the insurer's insolvency."

We thus conclude that RSA 402-C:40, I, does not violate the doctrine of unconstitutional conditions because the condition is germane to the legitimate legislative objectives of the statute. Any burden on the rights of potential third party claimants imposed by RSA 402-C:40, I, is not unreasonable or arbitrary. "The Act poses a difficult decision for a [potential] third party [claimant], [but that is] a difficulty made necessary by the unfortunate and uncontrollable fact of the insolvency, a fact which affects the [potential third party claimant] and the insured alike." *Koken v. Reliance Ins. Co.*, 893 A.2d 70, 85 (Pa. 2006).

*II. Equal Protection*

The petitioners argue that RSA 402-C:40, I, violates the equal protection provisions of the State Constitution. *See* N.H. CONST. pt. I, arts. 2, 12, 14. They assert that these provisions are implicated because the statute treats potential third party claimants differently from other potential plaintiffs who have potential claims against uninsured individuals or individuals insured by insurers not in liquidation.

The equal protection guarantee is "essentially a direction that all persons similarly situated should be treated alike." *In re Sandra H.*, 150 N.H. 634, 637 (2004) (quotation omitted). Thus, two basic prerequisites of the equal protection inquiry are the existence of a classification and the differing treatment of persons so classified. *See Silveira v. Lockyer*, 312 F.3d 1052, 1088 (9th Cir. 2002) ("in order for a state action to trigger equal protection review at all, that action must treat similarly situated persons

*disparately"* (emphasis added)), *cert. denied,* 540 U.S. 1046 (2003); *Phelps v. Phelps,* 446 S.E.2d 17, 20 (N.C. 1994) ("[w]ithout some type of 'classification' . . . there is no equal protection claim").

■ The petitioners urge that RSA 402-C:40, I, treats the class of potential third party claimants differently from other potential plaintiffs because it implicates only the potential third party claimants' right to a remedy guaranteed by Part I, Article 14 of the State Constitution. We disagree, however, because RSA 402-C:40, I, does nothing to restrict the statutory and common law rights available to potential third party claimants at the time of the injury. *See Trovato,* 143 N.H. at 525 (Article 14 only requires a remedy that conforms to the statutory and common law rights applicable at the time of the injury). All potential third party claimants maintain the right to pursue their statutory and common law claims against their potential defendants, regardless of whether those defendants are insured by an insurer in liquidation. A third party claimant's right to pursue a potential defendant is not lost by the mere existence of RSA 402-C:40, I.

The petitioners further argue that by choosing not to file a claim in the liquidation and instead choosing to pursue their claims against the insured, potential third party claimants lose their right to recover from the insurer as a post-judgment creditor. Essentially, they argue that RSA 402-C:40, I, requires that third party claimants waive part of their claim in order to collect from the insurer, while plaintiffs with claims against defendants insured by an insurer not in liquidation need not do so. The Commissioner contends that plaintiffs in general do not have a right to recover directly from their defendant's insurer, except in limited circumstances as provided by statute. Both parties acknowledge that we have yet to directly address this issue. We need not do so now.

■ Even assuming that all plaintiffs have a common law right to recover from their defendant's insurer as a post-judgment creditor, any impact that RSA 402-C:40, I, has on that right does not result in a violation of the equal protection provisions of the State Constitution. Our middle-tier scrutiny test requires that legislative classifications of the right to recover for personal injuries "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation in order to satisfy State equal protection guarantees." *Gould,* 126 N.H. at 408-09 (quotation omitted). The classification created by RSA 402-C:40, I, is based upon the fact of the insurer's insolvency. For the same reasons upon which we base our decision regarding the petitioners' claim under the doctrine of unconstitutional conditions, this classification is reasonable, not arbitrary,

and fairly and substantially relates to the legislative objectives of protecting policyholders and apportioning unavoidable loss.

It is only after a potential third party claimant chooses to file a claim in the liquidation that he or she must release the insured of liability up to the policy limits, and is thus treated differently from similarly situated persons, *i.e.*, other potential third party claimants who choose not to file a claim in the liquidation. However, the petitioners make no argument as to this classification, except to urge that we not examine it. Therefore, we will not address it.

We recognize that there is an overlap between our rational basis and intermediate or middle-tier scrutiny tests in that both tests include the terms "reasonable" and "arbitrary." *Compare, e.g., LeClair v. LeClair,* 137 N.H. 213, 223 (1993), *with Gould,* 126 N.H. at 408-09. However, neither party has asked us to, and we will not in this case, address the elusive nature of our middle-tier scrutiny test as it necessitates further briefing and argument.

*III. Due Process*

The petitioners contend that if the State may condition a benefit upon the relinquishment of a constitutional right, it cannot do so without incorporating procedural due process safeguards into the decision-making process to ensure that potential third party claimants are able to make a knowing, voluntary and intelligent choice whether to file a claim in the liquidation. In essence, the petitioners argue that RSA 402-C:40, I, provides inadequate notice of the consequences of participation in the statutory scheme through the filing of a claim in liquidation, and thus deprives the third party claimant of his right of action against the insured without due process of law.

When the government seeks to take action that will deprive a citizen of a property or liberty interest, due process requires that the citizen receive meaningful notice of the government's action. *City of Claremont v. Truell,* 126 N.H. 30, 36 (1985). Here, RSA 402-C:40, I, and the proof of claim form that is signed by the third party claimant, both provide notice that the filing of a claim will result in the release of the insured of liability up to the applicable policy limits. To the extent that due process requires that third party claimants receive notice of the consequences of filing a claim, that requirement is satisfied by the notice contained in the proof of claim form. *Cf. Truell,* 126 N.H. at 38-39 (requiring that summons issued by court to parents of a child who is the subject of a CHINS petition must include notice of potential liability for expenses incurred by the government in connection therewith). The

petitioners cite no authority, and we found none, to indicate that due process requires actual forecasts of potential liability or a pre-determination of the actual extent of any monetary "loss."

Furthermore, were the Commissioner to make predictions about the extent of a potential third party claimant's recovery in the liquidation, such predictions would be wholly speculative and unreliable, as no reasonable prediction of recovery can be made until the Commissioner knows the final cost of the administration of the liquidation as well as the size of every claim filed in the liquidation by every third party claimant. *See generally* RSA 402-C:44 (Supp. 2005). The imposition of such a burden upon the liquidator or the Commissioner would be unreasonable in light of the near impossibility of making the predictions that the petitioners seek, and any benefit that the petitioners would receive as a result of the prediction would be minimal given the unreliability of the prediction and the inherent uncertainty of any creditor's recovery in a liquidation. *Cf. Truell*, 126 N.H. at 39.

*Affirmed.*

DALIANIS and GALWAY, JJ., concurred; BRODERICK, C.J., concurred specially.

BRODERICK, C.J., concurring specially. I concur with the affirmance, and write separately to further explain the overlap between our rational basis and intermediate or middle-tier scrutiny tests.

We first adopted an intermediate scrutiny approach to constitutional review in *Carson v. Maurer*, 120 N.H. 925 (1980), when we examined the constitutionality of RSA chapter 507-C, which created various classifications for medical injury actions. After determining that the right to recover for personal injuries is not a "fundamental right," and therefore did not require that we apply strict scrutiny, we nevertheless held that it was an "important substantive right" protected by the State Constitution. *Carson*, 120 N.H. at 931-32. We therefore held that the right was "sufficiently important to require that the restrictions imposed on those rights be subjected to a more rigorous judicial scrutiny than allowed under the rational basis test." *Id.* at 932. "Middle-tier equal protection scrutiny thus entered the jurisprudence of the State Constitution . . . ." *City of Dover v. Imperial Cas. & Indemn. Co.*, 133 N.H. 109, 121 (1990) (Souter, J., dissenting). This new level of scrutiny required that legislation be "reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Carson*, 120 N.H. at 932 (citing *State v. Scoville*, 113 N.H. 161, 163 (1973),

in turn quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).

Justice Souter, while still a member of this court, examined our holding in *Carson* in his dissent in *Dover*. He noted that the *Carson* intermediate test "suffers from a proven susceptibility to confusion with other standards of equal protection review, a failing perhaps portended by the derivation of *Carson*'s language from *F.S. Royster*." *Dover*, 133 N.H. at 121 (Souter, J., dissenting). He first explained that the test applied in *Royster*, although using the term "fair and substantial," was in fact "what we today would call the first-tier, rational basis test." *Id.* at 122 (Souter, J., dissenting). He continued, "Although the federal judiciary, like this court, has subsequently tried to use *Royster*'s formulation to provide 'somewhat heightened' middle-tier scrutiny, the very opinions cited in *Carson* as so applying it have reverted to type, as it were, by lapsing into rational basis terminology." *Id.* (Souter, J., dissenting) (quoting *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 441 (1985)) (citation omitted).

Justice Souter continued his critique of the intermediate standard by questioning whether legislation examined under that test should receive the same high level of deference it does under rational basis review. *Id.* at 122-23 (Souter, J., dissenting). The test as articulated in *Carson* only required that the legislation be related to a "legitimate legislative objective." *Carson*, 120 N.H. at 933. He explained:

> This pledge of deference is a shaky one, however, thanks to uncertainty over the meaning of the second segment of the standard derived from *Royster*, requiring a "fair and substantial" relationship between the chosen classification and the legitimate legislative objective. This uncertainty must be seen as a further condition not only facilitating the identification (or misidentification) of the *Carson* standard with the rational basis test, as we have seen, but also placing temptation in the way of those inclined to impose a far stricter standard in the name of intermediate scrutiny . . . .

*Dover*, 133 N.H. at 123 (Souter, J., dissenting). That is, where intermediate scrutiny professes to impose a higher standard on the government to justify its action, the government should have to prove more than that its ends are merely "legitimate." Indeed, the federal intermediate scrutiny standard that *Carson* purportedly adopted requires not that an individual's substantive right be important, but rather that the governmental objective be important. *See, e.g., Craig v. Boren*, 429 U.S. 190, 197 (1976) (equal protection requires that certain classifications "must serve important governmental objectives and must be substantially related

to achievement of those objectives"); *United States v. Virginia*, 518 U.S. 515, 533 (1996) (same).

After explaining the problems inherent in *Carson* and the intermediate scrutiny test it articulated, Justice Souter stated, "[T]he task confronting the court is to identify the requisite degree of efficiency, or fit, that intermediate scrutiny demands." *Dover*, 133 N.H. at 123-24 (Souter, J., dissenting). He then encouraged "both advocates before the court and members of the court itself [to] confront the difficulty in the earliest possible case, for until the job is attempted, the intermediate nature of the scrutiny will remain elusive." *Id.* at 124 (Souter, J., dissenting).

Justice Souter concluded his dissent by arguing that the court in *Dover* had misapplied the purported middle-tier test set forth in *Carson*. He felt that the standard was not only wrongly adopted, but also that the *Dover* court in fact applied strict scrutiny under the label of an intermediate analysis:

> And so the "fair and substantial" relation test is metamorphosed yet again. A formulation that began its juridical life as a rational basis test, and was ostensibly adopted by this court as a standard of intermediate review, is now being applied by a majority of the court to impose the strictest scrutiny known to equal protection analysis. There could be no more striking argument for the need to reexamine the *Carson* test and the conceptual basis underlying what passes for intermediate review.

*Id.* at 127 (Souter, J., dissenting).

One year after *Dover* was decided, we appeared to take on this challenge. In *Brannigan v. Usitalo*, 134 N.H. 50 (1991), we were asked to reverse *Carson* on the grounds that its "legal antecedents [were] questionable and its scholarship unsound." *Brannigan*, 134 N.H. at 54 (quotation omitted). After determining that "*Carson* was well-reasoned and considered with special care, was the product of a unanimous court, and has been repeatedly and consistently accepted and applied by this court," *id.* at 57 (quotation and ellipses omitted), we upheld its articulation of the intermediate scrutiny test as inquiring: (1) whether the statute has a fair and substantial relation to a legitimate legislative objective; and (2) whether it imposes unreasonable restrictions on private rights, *id.* at 56.

I agree with *Brannigan* to the extent that the court there reaffirmed the conclusion that certain substantive rights "are sufficiently important to require that the restrictions imposed on those rights be subjected to a more rigorous judicial scrutiny than allowed under the rational basis test." *Carson*, 120 N.H. 932. Further, I do not suggest that intermediate scrutiny should no longer be applied in certain equal protection situations, as this

case demonstrates. *See also Dow v. Town of Effingham*, 148 N.H. 121, 124-25 (2002). I believe, however, that the *Brannigan* court failed to recognize and resolve the confusion existent in our intermediate scrutiny test. Indeed, as Justice Souter acknowledged, and the *Brannigan* court ignored, even post-*Carson* we have "recogniz[ed] candidly that the rational basis test and the test derived from *Royster* have in some instances been treated as interchangeable." *Dover*, 133 N.H. at 122 (Souter, J., dissenting) (citing *State v. Deflorio*, 128 N.H. 309, 315 (1986) (fair and substantial relation test "assumed to be equivalent to rational basis test")).

This confusion can also be seen in our other levels of scrutiny—namely, rational basis review and strict scrutiny. Both use some form of the terms "reasonable," "arbitrary," or "unduly restrictive." Our rational basis test requires that legislation be rationally related to a legitimate governmental interest. *See Taylor v. Town of Plaistow*, 152 N.H. 142, 145 (2005). However, under that standard we have additionally inquired into the "reasonableness of a particular zoning provision," *id.*, and required that legislation challenged under the rational basis test "not unduly restrict fundamental rights," *Dow*, 148 N.H. at 124 (quotation omitted). Our strict scrutiny test requires that restrictions on fundamental rights must be necessary to achieve a compelling governmental interest. *Seabrook Police Assoc. v. Town of Seabrook*, 138 N.H. 177, 179 (1993). However, the *Seabrook* court also declared that a "regulation [must be] reasonably related to its objective and [must] not unduly restrict the fundamental right in question." *Id.* at 179.

It is because of the confusion in our standards of constitutional review that I join the majority in recognizing the overlap between our rational basis and intermediate or middle-tier scrutiny standards. I agree that this is not the case to address these issues, as they are not raised by the record or the parties. However, like Justice Souter, I encourage future litigants to confront the elusive nature of the intermediate standard. Specifically, I believe that we must address: (1) whether the terms "reasonable" and "arbitrary" should continue to be part of our intermediate test, *compare, e.g., LeClair v. LeClair*, 137 N.H. 213, 223 (1993), *with Carson*, 120 N.H. at 932-33; and (2) whether the governmental objective required by the test should be merely "legitimate" as in rational basis review, or whether we should require an "important" objective due to the "fair and substantial" prong of the intermediate scrutiny test, *compare Brannigan*, 134 N.H. at 56, *with Craig*, 429 U.S. at 197, *and Virginia*, 518 U.S. at 533.

A new articulation of this test is necessary to bring it into conformity with our other levels of constitutional review. An intermediate scrutiny standard should require more scrutiny than the rational basis test—namely, that legislation merely be rationally related to a legitimate

governmental interest—but a less exacting examination than our strict scrutiny test—namely, that legislation be necessary to achieve a compelling governmental interest and narrowly tailored to meet that end. As currently articulated, it is not clear whether our intermediate scrutiny test does so.