748

COMMUNITY RESOURCES FOR JUSTICE, INC.

v.

CITY OF MANCHESTER

Argued: November 14, 2006
Opinion Issued: January 24, 2007

*Nixon Peabody LLP*, of Manchester (*David A. Vicinanzo & a.* on the brief, and *Mr. Vicinanzo* orally), for the plaintiff.

*Thomas I. Arnold, III*, deputy city solicitor, of Manchester, on the brief and orally, for the defendant.

DALIANIS, J. The defendant, the City of Manchester (City), appeals the orders of the Superior Court (*Abramson,* J.) reversing the decision of the City's Zoning Board of Adjustment (ZBA) and remanding to the ZBA with instructions to grant a variance to the plaintiff, Community Resources for Justice, Inc. (CRJ). We reverse and remand for further proceedings.

I

The trial court recited the following facts: CRJ is an organization that operates residential transition centers or "halfway houses" under contracts with the Federal Bureau of Prisons. In the fall of 2004, CRJ purchased a building on Elm Street in Manchester, intending to use the building as a halfway house. The building is located in the central business district and currently houses both commercial and residential uses. The building has three floors; CRJ intended to renovate part of the second floor and the entire third floor for the halfway house and leave the rest of the building undisturbed.

CRJ applied for a building permit to operate the halfway house. The City's building commissioner denied the permit application on the ground that CRJ's proposed use constituted a "correctional facility" as defined by the City's zoning ordinance. A "correctional facility" is not a permitted use in any of the city's zoning districts. CRJ appealed the building commissioner's decision to the ZBA and applied to the ZBA for a variance. The ZBA denied CRJ's appeal and its request for a variance. CRJ's rehearing requests were also denied.

CRJ appealed the ZBA's denials of its challenge to the building commissioner's decision and its variance request to the superior court. The trial court denied CRJ's appeal related to the building commissioner's decision. CRJ did not appeal that decision to this court. Accordingly, for the purposes of this appeal, CRJ's proposed halfway house constitutes a "correctional facility" within the meaning of the City's zoning ordinance.

As for the variance request, the trial court remanded the matter to the ZBA for further hearing and to make findings on unnecessary hardship. The court stated that it appeared that the ZBA may have applied a standard that was overly restrictive and inconsistent with our decision in *Simplex Technologies v. Town of Newington*, 145 N.H. 727 (2001).

The ZBA reviewed the matter at a non-public business meeting on February 2, 2006, and, finding that CRJ had failed to satisfy the *Simplex* requirements for unnecessary hardship, voted to deny CRJ's request for a variance. CRJ's request for a rehearing was denied.

On appeal to the superior court, CRJ asserted that the ZBA's decision was unreasonable because the ZBA misapplied *Simplex* upon remand and based its decision upon unsubstantiated fears. CRJ also argued that the zoning classification, which prohibits a "correctional facility" anywhere in the city, was unconstitutional.

Upon review of the certified record, the trial court found that "[t]o the extent that board members may have contemplated other more preferable uses for the property, rather than the reasonableness of just the proposed

use, the ZBA may have, at least in part, applied the wrong standard." The court then examined each of the prongs of the *Simplex* unnecessary hardship test.

With respect to the first prong, the trial court ruled that the ZBA's determination was unreasonable and unlawful and that CRJ met its burden of showing that it meets the requirements under the first *Simplex* prong. The court also determined that the ZBA's findings with respect to the second and third prongs of the *Simplex* test were unreasonable, unlawful and unsupported by the evidence. The trial court therefore reversed the ZBA's decision and granted CRJ's request for a variance. Because it decided the case on other grounds, the trial court did not address or hold an evidentiary hearing upon CRJ's other arguments. In response to the City's motion for reconsideration, the court revised its decision by remanding the matter to the ZBA with instructions to grant CRJ a variance.

## II

On appeal, the City argues that the trial court erred by: (1) improperly substituting its judgment for that of the ZBA; (2) finding that CRJ met the first prong of the *Simplex* unnecessary hardship test; and (3) finding that no evidence supported the ZBA's determination that CRJ failed to demonstrate unnecessary hardship.

We will uphold the trial court's decision on appeal unless the evidence does not support it or it is legally erroneous. *Bacon v. Town of Enfield*, 150 N.H. 468, 471 (2004). Our inquiry is not whether we would find as the trial court found, but rather whether the evidence before the court reasonably supports its findings. *Vigeant v. Town of Hudson*, 151 N.H. 747, 750 (2005).

For its part, the trial court must treat all factual findings of the ZBA as *prima facie* lawful and reasonable. RSA 677:6 (1996). "It may set aside a ZBA decision if it finds by the balance of probabilities, based on the evidence before it, that the ZBA's decision was unreasonable." *Chester Rod & Gun Club v. Town of Chester*, 152 N.H. 577, 580 (2005) (quotation and brackets omitted).

> To obtain a variance, an applicant must show that: (1) granting the variance will not be contrary to the public interest; (2) special conditions exist such that a literal enforcement of the provisions of the ordinance will result in unnecessary hardship; (3) granting the variance is consistent with the spirit of the ordinance; (4) by granting the variance substantial justice is done; and (5) granting

the variance does not diminish the value of surrounding properties.

*Id.; see also* RSA 674:33, I(b) (1996).

■ To establish "unnecessary hardship" when seeking a use variance, an applicant must demonstrate that: (1) a zoning restriction as applied to the applicant's property interferes with the applicant's "reasonable use of the property, considering the unique setting of the property in its environment"; (2) no fair and substantial relationship exists between the general purposes of the zoning ordinance and the specific restriction on the property; and (3) the variance would not injure the public or private rights of others. *Simplex,* 145 N.H. at 731-32.

■ "As our cases since *Simplex* have emphasized, the first prong of the *Simplex* standard is the critical inquiry for determining whether unnecessary hardship has been established." *Harrington v. Town of Warner,* 152 N.H. 74, 80 (2005). To meet its burden of proof under this part of the *Simplex* test, the applicant must demonstrate, among other things, that the hardship is a result of the property's unique setting in its environment. *Id.* at 81. This requires that the zoning restriction burden the property "in a manner that is distinct from other similarly situated property." *Id.* While the property need not be the only such burdened property, "the burden cannot arise as a result of the zoning ordinance's equal burden on all property in the district." *Id.* In addition, the burden must arise from the property and not from the individual plight of the landowner. *Id.* Thus, the landowner must show that the hardship is a result of specific conditions of the property and not the area in general. *Id.* As we explained in *Rancourt v. City of Manchester,* 149 N.H. 51, 54 (2003), "hardship exists when special conditions of the land render the use for which the variance is sought 'reasonable.'"

Based upon our review of the certified record, we conclude that it does not reasonably support the trial court's determination that CRJ met its burden with respect to the first prong of the *Simplex* test. The evidence does not reasonably support the trial court's conclusion that CRJ's property was burdened by the restriction in a manner that was distinct from similarly situated property. *See Harrington,* 152 N.H. at 81. Nor does the evidence reasonably support the trial court's conclusion that the hardship resulted from special conditions of the land, rather than the area in general. *See id.; see also Rancourt,* 149 N.H. at 54.

The evidence CRJ presented did not demonstrate that its proposed site was unique, as compared to the surrounding lots. *Garrison v. Town of Henniker,* 154 N.H. 26, 32-35 (2006). While there was evidence that CRJ's

property was located near public transportation and treatment facilities, as well as other city services that halfway house residents might need, there was no evidence that CRJ's property was unique in this respect. Presumably, all of the buildings in this location share these characteristics. These characteristics, alone, "do not distinguish [CRJ]'s proposed site from any other [site] in the area." *Id.* at 34.

Moreover, contrary to the trial court's finding, there was no evidence in the certified record that demonstrated "how the size and layout of this specific building made the property particularly appropriate for the proposed use." While the certified record contained a map of the building's layout, there is no evidence that this layout made this building uniquely suited as a halfway house. *See Rancourt*, 149 N.H. at 54. By contrast, in *Rancourt*, where the proposed use was the stabling of two horses, there was evidence that the lot at issue was "uniquely configured" in that the rear portion of it was considerably larger than the front and that there was a thick wooded buffer around the proposed paddock area. *Id.*

■ Absent evidence that CRJ's proposed use of the property was reasonable, considering the property's unique setting in its environment, we hold that the trial court erred when it concluded that CRJ met its burden of proof with respect to the first prong of the *Simplex* test. In light of this conclusion, we need not address whether the evidence reasonably supported the trial court's determinations with respect to the other prongs of the test. If any one of the ZBA's reasons supported its denial of a variance, CRJ's appeal of that decision fails. *See Jensen's, Inc. v. City of Dover*, 130 N.H. 761, 765 (1988). Accordingly, we reverse the trial court's reversal of the decision of the ZBA to deny CRJ a variance.

### III

CRJ argues that even if the trial court erred when it ruled that the ZBA's denial of the variance was unreasonable, we may affirm on other grounds. CRJ contends that the City's ban on correctional facilities is: (1) ultra vires because it exceeds the authority granted the City by the state enabling act, *see* RSA 674:16-:23 (1996 & Supp. 2006); and (2) unconstitutional because it either deprived CRJ of its state right to substantive due process or violated its state and federal rights to equal protection. While the trial court did not address these arguments, we may do so in the first instance to the extent that they involve questions of law. *See Shannon v. Foster*, 115 N.H. 405, 407 (1975).

## A

CRJ first argues that the City's ban on correctional facilities is ultra vires because it exceeds the powers delegated to it by the zoning enabling legislation. *See Weare Land Use Assoc. v. Town of Weare*, 153 N.H. 510, 511 (2006). CRJ asserts, "By specifically targeting, and then categorically banning, this essential community service from within the City's borders, this part of the Ordinance contravenes the general welfare provision of [RSA] 674:16." *See Britton v. Town of Chester*, 134 N.H. 434, 441 (1991).

This court is the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *DeLucca v. DeLucca*, 152 N.H. 100, 103 (2005). In interpreting a statute, we first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Id.*

The zoning enabling act, RSA 674:16, I (Supp. 2006) provides:

> For the purpose of promoting the health, safety, or the general welfare of the community, the local legislative body of any city, town, or county in which there are located unincorporated towns or unorganized places is authorized to adopt or amend a zoning ordinance under the ordinance enactment procedures of RSA 675:2-5.

This act "grants municipalities broad authority to pass zoning ordinances for the health, safety, morals, and general welfare of the community." *Asselin v. Town of Conway*, 137 N.H. 368, 371 (1993). "Because a municipality's power to zone property to promote the health, safety and general welfare of the community is delegated to it by the State, the municipality must exercise this power in conformance with the enabling legislation." *Marchand v. Town of Hudson*, 147 N.H. 380, 384 (2001). "[W]here zoning is exercised for considerations or purposes not embodied in an enabling act, it will be held invalid ... as an ultra vires enactment beyond the scope of the zoning authority delegated." 1 A.H. RATHKOPF & D.A. RATHKOPF, RATHKOPF'S THE LAW OF ZONING AND PLANNING § 1:11, at 1-35 (2005).

In *Britton*, 134 N.H. at 440, we held that "[w]hen an ordinance will have an impact beyond the boundaries of the municipality, the welfare of the entire affected region must be considered in determining the ordinance's validity." We interpreted "the general welfare provision of the zoning enabling statute to include the welfare of the 'community' ... in which a municipality is located and of which it forms a part." *Britton*, 134 N.H. at 441 (citation omitted). As we explained: "Municipalities are not

isolated enclaves, far removed from the concerns of the area in which they are situated. As subdivisions of the State, they do not exist solely to serve their own residents, and their regulations should promote the general welfare, both within and without their boundaries." *Id.*

In *Britton*, the plaintiffs, low- and moderate-income people who had been unable to find affordable housing in the town of Chester, challenged the validity of a zoning ordinance that "provided for a single-family home on a two-acre lot or a duplex on a three-acre lot, and ... excluded multi-family housing from all five zoning districts in the town." *Id.* at 437-38. After the plaintiffs petitioned for declaratory and injunctive relief, the town amended its ordinance to permit "multi-family housing as part of a 'planned residential development' ..., a form of multi-family housing required to include a variety of housing types, such as single-family homes, duplexes, and multi-family structures." *Id.* at 438. The master found that the ordinance, even as amended, "placed an unreasonable barrier to the development of affordable housing for low- and moderate-income families." *Id.*

We held that the ordinance was ultra vires because it failed to provide for the lawful needs of the community, broadly defined, and therefore conflicted with the enabling act. *Id.* at 441. We based our holding upon the master's finding that "'there are no substantial and compelling reasons that would warrant the Town of Chester, through its land use ordinances, from fulfilling its obligation to provide low[-] and moderate[-]income families within the community and a proportionate share of [the] same within its region from a realistic opportunity to obtain affordable housing.'" *Id.*

CRJ asks that we extend *Britton* to the facts of this case. The City counters that "[p]rivately run correctional institutions, including halfway houses, as separate from publicly administered correctional institutions, including halfway houses[,] do not implicate the general welfare within the meaning of the zoning ordinance." The City concedes that its ban on correctional institutions does not apply to State-run institutions and asserts that such institutions "adequately provide for the general welfare." Neither party addresses whether the City's ban applies to correctional institutions run by the federal government. *See* 4 A.H. RATHKOPF & D.A. RATHKOPF, RATHKOPF'S THE LAW OF ZONING AND PLANNING § 76.23, at 76-79 (2005) (land owned or leased by the United States or a federal agency for purposes authorized by Congress "is immune from and supersedes state and local laws in contravention thereof"). Both parties appear to assume that the City's ban applies to correctional institutions run by private parties under contract with the federal government. *Cf. Northern N.H. Mental Health Housing, Inc. v. Town of Conway*, 121 N.H.

811, 812, 814 (1981) (holding private corporation that sought to establish residence for mentally ill individuals under contract with state was not bound by local zoning ordinances, absent statutory authority to contrary). Accordingly, we proceed under the same assumption.

■ We disagree with the City that correctional institutions run by private entities under contract with the Federal Bureau of Prisons do not implicate the general welfare within the meaning of the enabling legislation. To the contrary, as a federal judge noted in her letter to the ZBA regarding CRJ's application for a variance: "It is difficult to imagine a job more important in the criminal justice system than working to ease an offender's transition back into society. This is important, of course, for the offender. More significantly, it is important for the community to which these individuals will inevitably return." Moreover, like the ordinance at issue in *Britton*, the ordinance in this case has an impact beyond the City's borders. As CRJ observes:

> Were this Court to endorse the Ordinance and its application to the proposed use, the communities surrounding Manchester will be free to[] follow Manchester's lead and ban halfway houses. . . . . The effects of such a result would not end at the New Hampshire border. If the New Hampshire communities were to act as Manchester has, it could effectively push all new halfway houses out of New Hampshire.

We limit our holding on this issue to this question of law and remand for further proceedings. Because this appeal originated as an appeal of the ZBA's denial of a variance to CRJ and the trial court did not address CRJ's alternative arguments or hold an evidentiary hearing on them, neither party has yet had an opportunity to present evidence related to CRJ's argument that the ordinance is ultra vires.

B

■ CRJ next asserts that the ban on correctional facilities violates its substantive due process rights under the New Hampshire Constitution. In determining whether an ordinance is a proper exercise of the City's police power, and thus able to withstand a substantive due process challenge under the State Constitution, we apply the rational basis test. *Boulders at Strafford v. Town of Strafford*, 153 N.H. 633, 636 (2006). In *Boulders*, we clarified that this test "requires that legislation be only rationally related to a legitimate governmental interest" and that it "contains no inquiry into whether legislation unduly restricts individual rights." *Id.* at 641. Under our rational basis test, we presume that the challenged ordinance is valid

and require the challenger to prove otherwise. *See Verizon New England v. City of Rochester*, 151 N.H. 263, 270 (2004).

In an as-applied challenge, such as CRJ's, we examine "the relationship of the particular ordinance to particular property under particular conditions existing at the time of litigation." *Dow v. Town of Effingham*, 148 N.H. 121, 124 (2002). Thus, we analyze whether the ordinance is rationally related to a legitimate governmental interest under the facts of this case.

■ The City articulates several legitimate governmental interests that the ordinance conceivably could serve such as: "[c]oncerns that the prisoners to be housed at a residential transition facility would either pose some threat to the surrounding community, engage in recidivism, exacerbate the City's perceived burden in accommodating a disproportionate share of social services or affect surrounding property values." These interests need not be the City's actual interests in adopting the ordinance nor need they be based upon facts. In rational basis review, we will not independently examine the factual basis for the ordinance. *See Appeal of Salem Regional Med. Ctr.*, 134 N.H. 207, 215 (1991). Rather, we will inquire only as to "whether the legislature could reasonably conceive to be true the facts" upon which it is based. *Winnisquam Reg. Sch. Dist. v. Levine*, 152 N.H. 537, 539-40 (2005) (quotation omitted). Here, we conclude that the City could reasonably conceive these facts to be true, and thus that the ordinance serves or could conceivably serve legitimate governmental interests.

■ We next examine whether the ordinance, as applied to CRJ's property, bears a rational relationship to these interests. As CRJ proposes to construct a halfway house for federal prisoners still serving out their sentences, we conclude that applying this ordinance to CRJ's property is rationally related to the conceivable purposes for that ordinance. Accordingly, we hold that the ordinance does not violate CRJ's state constitutional right to substantive due process.

## C

Finally, CRJ contends that the City's ban of correctional facilities, as applied to CRJ, violates its federal and state constitutional rights to equal protection. *See* U.S. CONST. amend. XIV; N.H. CONST. pt. I, art. 12. Although in its initial brief, CRJ appeared to argue that the ordinance was unconstitutional on its face, in its reply brief, CRJ clarified that it "challenged the ordinance 'as applied' to it rather than as facially invalid." As CRJ has apparently abandoned any argument it may have made that

the ordinance was facially unconstitutional, we confine our analysis to whether the ordinance is unconstitutional as applied.

We first address CRJ's claim under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), and cite federal opinions for guidance only, *id.* at 232-33. "In considering an equal protection challenge under our State Constitution, we must first determine the [correct] standard of review by examining the purpose and scope of the State-created classification and the individual rights affected." *In re Sandra H.*, 150 N.H. 634, 637 (2004) (quotation omitted). Classifications based upon suspect classes or affecting a fundamental right are subject to strict scrutiny. *Id.* Classifications involving "important substantive rights" are subject to intermediate scrutiny. *Id.* at 638 (quotation omitted). "Finally, absent some infringement of a fundamental right, an important substantive right, or application of some recognized suspect classification, the constitutional standard to be applied is that of rationality." *Id.*

 As the right to use and enjoy property is an important substantive right, we use our intermediate scrutiny test to review equal protection challenges to zoning ordinances that infringe upon this right. *LeClair v. LeClair*, 137 N.H. 213, 222 (1993). We first adopted an intermediate scrutiny approach to constitutional review in *Carson v. Maurer*, 120 N.H. 925 (1980). *Gonya v. Comm'r, N.H. Ins. Dep't*, 153 N.H. 521, 535 (2006) (Broderick, C.J., concurring specially). Under this test, the challenged legislation must be "reasonable, not arbitrary, *and* must rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Carson*, 120 N.H. at 932 (quotation omitted).

In his concurrence in *Gonya*, Chief Justice Broderick observed that our test for intermediate-level scrutiny may be overly deferential to challenged legislation by requiring that it be substantially related only to a legitimate legislative objective, rather than an important one. *See Gonya*, 153 N.H. at 536, 538-39 (Broderick, C.J., concurring specially); *see also City of Dover v. Imperial Cas. & Indemn. Co.*, 133 N.H. 109, 122-23 (1990) (Souter, J., dissenting). He also observed that although our test for intermediate-level scrutiny was intended to be less deferential to legislation than our test for rational basis, there was significant overlap between the two tests. *See Gonya*, 153 N.H. at 538 (Broderick, C.J., concurring specially). For instance, until we clarified our rational basis test in *Boulders*, both our rational basis and intermediate scrutiny tests "employ[ed] the terms 'reasonable,' 'arbitrary,' and 'unduly restrictive.'" *Boulders*, 153 N.H. at 640. Chief Justice Broderick encouraged future litigants to ask the court to address:

(1) whether the terms "reasonable" and "arbitrary" should continue to be part of our intermediate test; and (2) whether the governmental objective required by the test should be merely "legitimate" as in rational basis review, or whether we should require an "important" objective due to the "fair and substantial" prong of the intermediate scrutiny test.

*Gonya*, 153 N.H. at 538 (Broderick, C.J., concurring specially) (citations omitted). He explained:

A new articulation of this test is necessary to bring it into conformity with our other levels of constitutional review. An intermediate scrutiny standard should require more scrutiny than the rational basis test—namely, that legislation merely be rationally related to a legitimate governmental interest—but a less exacting examination than our strict scrutiny test—namely, that legislation be necessary to achieve a compelling governmental interest and narrowly tailored to meet that end. As currently articulated, it is not clear whether our intermediate scrutiny test does so.

*Id.* at 538-39 (Broderick, C.J., concurring specially).

To eliminate confusion in our tests for constitutional review, we held in *Boulders* that our rational basis test "requires that legislation be only rationally related to a legitimate governmental interest" and that it "contains no inquiry into whether legislation unduly restricts individual rights, and that a least-restrictive-means analysis is not part of this test." *Boulders*, 153 N.H. at 641. Although "[w]e recognize[d] that our holding . . . affect[ed] the other standards of constitutional review," we did not "make any changes to our intermediate and strict scrutiny tests," but we "encourage[d] future litigants to consider these issues . . . to aid our continued examination of these standards of constitutional review." *Id.*

CRJ has asked us to clarify our intermediate scrutiny test. It asserts, "Although this Court should find the Ordinance unconstitutional as applied to CRJ under any articulation of middle tier scrutiny, there appears to be some confusion as to which party bears the burden of proof under middle tier review under the New Hampshire Constitution." CRJ observes that we have previously held that the challenging party bears the burden of proof, *see Buskey v. Town of Hanover*, 133 N.H. 318, 322 (1990), while the United States Supreme Court has ruled that the government has the burden of proof for middle tier review under the Federal Constitution, *see United States v. Virginia*, 518 U.S. 515, 533 (1996). Thus, CRJ states: "To the extent this Court's articulation of [the middle tier] standard is

inconsistent or unclear, it may be prudent to clarify in these proceedings that the burden falls upon the [City] under middle tier scrutiny."

In light of this request, we now take the opportunity to clarify our middle tier scrutiny test. While we recognize that the doctrine of stare decisis "demands respect in a society governed by the rule of law," *Brannigan v. Usitalo*, 134 N.H. 50, 53 (1991) (quotation omitted), "given the status of our standards of constitutional review, in our judgment it is better to undergo the hardships that may result from correcting these tests and bringing them into conformity with each other than to suffer the errors to persist," *Boulders*, 153 N.H. at 641.

Several factors inform our judgment regarding whether to depart from precedent, including whether: (1) the rule has proven to be intolerable simply by defying practical workability; (2) the rule is subject to a kind of reliance that would lend a special hardship to the consequence of overruling; (3) related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine; and (4) facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification. *Jacobs v. Director, N.H. Div. of Motor Vehicles*, 149 N.H. 502, 505 (2003); *Planned Parenthood of Southeastern PA. v. Casey*, 505 U.S. 833, 854-55 (1992). As the discussion below demonstrates, we believe that we must abandon the intermediate scrutiny test we developed in *Carson* because related principles of law have so far developed as to have left this test "no more than a remnant of abandoned doctrine." *Jacobs*, 149 N.H. at 505 (quotation omitted).

Although we apply an intermediate level of scrutiny to a broader category of rights than do the federal courts, we have intended our analysis under this level of scrutiny to be the same as that applied by the federal courts. *In re Sandra H.*, 150 N.H. at 638. While the federal test for intermediate scrutiny has evolved, ours has remained the same. As a result, the federal test for intermediate scrutiny and our test now differ in a number of respects.

We derived our test for intermediate scrutiny, in part, from *Reed v. Reed*, 404 U.S. 71, 76-77, (1971), in which the United States Supreme Court applied it to invalidate classifications based upon gender. *See Carson*, 120 N.H. at 932. The test itself was first articulated in *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). Under this test, "[a] classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Reed*, 404 U.S. at 76; *Carson*, 120 N.H. at 932. In *Reed*, the Court referred to this test as part of rational basis review. *Reed*, 404 U.S. at 76.

.

The Court used it, however, to give heightened scrutiny to gender-based classifications for the first time. N. REDLICH ET AL., UNDERSTANDING CONSTITUTIONAL LAW § 10.01, at 404 (3d ed. 2005).

In *Reed*, the Court "struck down a statute that preferred males to serve as estate administrators over equally qualified females." *Id.* Rather than merely accept the state's generalized assumptions that justified this preference, the Court "required the state to conduct hearings to ascertain the qualifications of men and women on an individualized basis." *Id.* In this way, the Court scrutinized the classifications under a test that was different from rational basis but not as exacting as strict scrutiny.

Since deciding *Reed*, the Court has explicitly devised a heightened scrutiny test by which to review gender-based classifications. *Id.* at 405. This test, first articulated in *Craig v. Boren*, 429 U.S. 190, 197 (1976), requires that such classifications serve important governmental objectives and be substantially related to achieving those objectives. This new standard of review is the standard the Court now identifies as intermediate scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Under this standard of review, the defender of the classification has the burden of demonstrating that its proffered justification is "exceedingly persuasive." *Virginia*, 518 U.S. at 533. To meet this "demanding" burden, the government must demonstrate that its justification is "genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* Further, the government "must not rely on overbroad generalizations." *Id.* Federal courts apply this test for intermediate scrutiny to "discriminatory classifications based on sex or illegitimacy." *Clark*, 486 U.S. at 461. Following its decision in *Craig*, the United States Supreme Court has questioned whether the *Royster* standard of review remains good law. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 294 (1982).

As currently articulated by the United States Supreme Court, the federal tests for intermediate scrutiny and rational basis review differ in a number of respects. For instance, under intermediate scrutiny, the burden of justifying the classification rests with the government, *see Virginia*, 518 U.S. at 533, while under rational basis review, the defender of the classification "has no obligation to produce evidence to sustain the ... classification"; rather, "the burden is on the one attacking the [legislation] to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe*, 509 U.S. 312, 320-21 (1993) (quotation and brackets omitted). Additionally, under intermediate scrutiny, the governmental interest must be "important," while rational basis requires that the interest be "legitimate." *Compare Virginia*, 518 U.S. at 533, *with Heller*, 509 U.S. at 320. Moreover, the fit between the means employed and the ends served is different; under

intermediate scrutiny, the means must be "substantially related" to the governmental interest, while under rational basis, they need only be "rationally related." *Compare Virginia,* 518 U.S. at 533, *with Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440 (1985). Further, under intermediate scrutiny, "the availability of ... alternatives to a ... classification is often highly probative of the validity of the classification," while under rational basis review, "[t]he fact that other means are better suited to the achievement of governmental ends therefore is of no moment." *Tuan Anh Nguyen v. INS,* 533 U.S. 53, 77-78 (2001) (O'Connor, J., dissenting).

By contrast, our tests for intermediate level scrutiny and rational basis review under our State Constitution have remained substantially similar to one another. For both rational basis and intermediate scrutiny, we have required that the government's objective merely be "legitimate." *Compare Verizon New England,* 151 N.H. at 270 (rational basis), *with Carson,* 120 N.H. at 933 (intermediate scrutiny). For both rational basis and intermediate scrutiny, we have presumed that the challenged legislation was valid and placed the burden of proving otherwise upon the challenger. *Compare Verizon New England,* 151 N.H. at 270 (rational basis), *with Quirk v. Town of New Boston,* 140 N.H. 124, 132 (1995) (burden of proof on challenger under intermediate scrutiny), *and Jensen's, Inc.,* 130 N.H. at 768 (presume legislation valid under intermediate scrutiny). Under both tests, "we will not examine the factual basis relied upon by the legislature as justification for the statute.... Our sole inquiry is whether the legislature could reasonably conceive to be true the facts on which the challenged legislative classifications are based." *Winnisquam Reg. Sch. Dist. v. Levine,* 152 N.H. at 539-40 (quotation omitted).

 To eliminate the confusion in our intermediate level of review and to make our test more consistent with the federal test, we now hold that intermediate scrutiny under the State Constitution requires that the challenged legislation be substantially related to an important governmental objective. *Virginia,* 518 U.S. at 533. The burden to demonstrate that the challenged legislation meets this test rests with the government (in this case, the City). *Id.* To meet this burden, the government may not rely upon justifications that are hypothesized or "invented *post hoc* in response to litigation," nor upon "overbroad generalizations." *Id.* Accordingly, we overrule *Carson v. Maurer,* 120 N.H. 925 (1980), to the extent that it did not employ this standard. Having

articulated this new standard, we remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

DUGGAN, GALWAY and HICKS, JJ., concurred.